**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| STEVEN C. SIZEMORE; and | : | |
| DVCOMM, LLC, | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | NO. 14-5543 |
| HOTWIRE COMMUNICATIONS, LLC; and | : | |
| HOTWIRE COMMUNICATIONS, Ltd., | : | |
| | : | |
| Defendants. | : | |

FILED

MAY 18 2015

MICHAEL E. KUNZ, Clerk
By _____Dep. Clerk

**MEMORANDUM**

YOHN, J.                                    May 18, 2015

This case concerns a disputed business relationship between plaintiffs Steven Sizemore

and his company DVComm, LLC ("Sizemore"), and defendants Hotwire Communications, LLC

and Hotwire Communications, Ltd. ("Hotwire"). According to the complaint, Sizemore, a

telecommunications consultant, provided a business plan and drew upon local contacts in 2010 to

assist Hotwire, a Pennsylvania company, with expanding its business into Atlanta, Georgia.

Sizemore alleges that Hotwire followed his plan and made use of his contacts when it entered the

Atlanta market in 2013— but that it did so without his involvement and without providing him

any of their agreed-upon compensation. Hotwire thus deprived Sizemore of the benefits of the

bargain, injured his reputation, and damaged his relationships with other members of the Atlanta

telecom industry. Sizemore filed suit against Hotwire, bringing seven claims sounding in tort,

contract, and equity. Hotwire moved to dismiss, arguing that all of the claims are deficient and

that the tort claims in particular should fail under Pennsylvania's "gist of the action" and

economic loss doctrines. Because Sizemore has adequately pleaded all but one of his claims,

CC· *legal*

and because applying the state law doctrines here would be both premature and a poor fit, I will grant the motion in part and deny it in part.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

Steven Sizemore, a resident of Lawrenceville, Georgia, began working in the telecommunications industry in 1998.  First Am. Compl. ("FAC") ¶¶ 2, 21.  In 2003, Sizemore created his own company, DVComm, LLC, to facilitate working (including as a consultant) with telecom companies that were operating in or looking to enter the Atlanta, Georgia market.  *Id.* ¶¶ 3-4.  In or around 2004, Hotwire Communications, LLC and Hotwire Communications, Ltd. (both based in Bala Cynwyd, Pennsylvania, the former a subsidiary of the latter, and collectively referred to as "Hotwire") began providing network services in the eastern United States.  *Id.* ¶¶ 9-13.  Hotwire first began offering fiber optic services in or around 2005.  *Id.* ¶ 15.

Sizemore and Hotwire were introduced by a mutual contact in 2004, and beginning in 2005, Sizemore would occasionally provide customer leads to Hotwire.  *Id.* ¶¶ 30-31.  In December 2009, Sizemore and Hotwire made closer connection through the same contact, who at that point was partnering with Sizemore while working with Hotwire to sell its products to an Atlanta hospital.  *Id.*  In anticipation of working together, Hotwire asked Sizemore to enter into a mutual non-disclosure agreement ("NDA"), and such an NDA was signed on December 16, 2009.  *Id.* ¶¶ 32, 36.  Though the NDA as written was between DVComm and Hotwire

---

[1] This account accepts as true all factual allegations made in plaintiffs' first amended complaint (Doc. No. 13).  *See Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996).  Defendants ask that I also consider two documents attached to their motion to dismiss: the nondisclosure agreement between Sizemore and Hotwire (Doc. No. 15-1) and the business plan provided by Sizemore to Hotwire (Doc. No. 15-2).  "As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings.  However, an exception to the general rule is that a document *integral to or explicitly relied upon* in the complaint may be considered without converting the motion [to dismiss] into one for summary judgment."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citations and internal quotation marks omitted).  Here, the complaint does explicitly rely upon both of these documents.  Moreover, plaintiffs have not disputed their authenticity.  *See In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368 n.9 (3d Cir. 1993) (requiring such documents to be "undisputedly authentic").  I will therefore consider these two documents as well without converting defendants' filing into a motion for summary judgment.

Communications, LLC, it was understood by all parties that the agreement also extended to Sizemore and both Hotwire entities. *Id.* ¶¶ 37-38.

On January 26, 2010, Hotwire president Kristin Johnson contacted Sizemore and asked to set up a telephone call to discuss Hotwire's possible expansion of its fiber optic business into the Atlanta market, the company having previously tried and failed to do so in 2007. *Id.* ¶¶ 39-40. Johnson and Sizemore had several conversations to that effect in January 2010. *Id.* ¶ 41. On April 5, 2010, Johnson again called Sizemore to discuss opening a Hotwire branch in Georgia. *Id.* ¶ 43. On April 13, 2010, Sizemore informed Johnson that he was "on board" with Hotwire, and on April 19, 2010, Hotwire arranged at its expense for Sizemore to travel to Hotwire's headquarters in Pennsylvania. *Id.* ¶¶ 44-45. In advance of this meeting, Sizemore produced a business plan for Hotwire's entry into the Atlanta market, and at the request of Johnson's assistant, he sent the plan to Hotwire. *Id.* ¶¶ 46-48.

On April 23, 2010, Sizemore met with Hotwire's leadership and reviewed the plan. *Id.* ¶ 61. Sizemore was given a map of Hotwire's infrastructure and told where he would work. *Id.* ¶ 62. Following the meeting, Hotwire made plans for its director of facilities, Michael Grandizio, to travel to Atlanta and attend meetings arranged by Sizemore with other businesses that could partner with Hotwire in its expansion. *Id.* ¶ 64. Prior to these meetings, Sizemore revised the business plan and sent the revised version to Hotwire, at which point Johnson thanked Sizemore for "all the effort [he] ha[d] put in on moving this forward." *Id.* ¶¶ 63, 65.

Johnson "accepted and approved Sizemore's business plan" on May 5, 2010, and she told Sizemore to proceed under it. *Id.* ¶ 71. Johnson directed Grandizio to meet with Sizemore in Atlanta to start taking steps outlined in the business plan, and Grandizio traveled to Atlanta on May 20-21, 2010. *Id.* ¶¶ 71-72. There, Sizemore took Grandizio to meetings with various third

parties that Sizemore had arranged; for example, Sizemore introduced Grandizio to Tim Kiser, who verbally agreed to provide certain services at his 55 Marietta Street facility to Hotwire at a discount. *Id.* ¶¶ 73-76. Sizemore further arranged meetings with at least three other individuals, including the majority owner of Netstream Communications. *Id.* ¶¶ 77-85. On June 2, 2010, Hotwire and Netstream entered into their own NDA, with Sizemore signing as Hotwire's authorized agent. *Id.* ¶ 86. By the end of June 2010, according to Sizemore, he had "fully delivered" on the business plan and Johnson "fully accepted" the plan. *Id.* ¶ 91.

At some point between May 24, 2010 and June 7, 2010, Johnson informed Sizemore that Hotwire would not activate its Atlanta network until it could confirm revenue of $15,000 per month. *Id.* ¶ 92. In response, Sizemore negotiated verbal commitments from various contacts that would have provided $12,000 per month in revenue. *Id.* ¶ 95. On June 15 and June 30, 2010, Sizemore requested that Johnson finalize his "compensation/participation"—Johnson had verbally agreed to pay Sizemore "in the range of" $120,000 per year as base compensation. *Id.* ¶ 96. Hotwire would not confirm Sizemore's future compensation. *Id.* ¶ 98. Sizemore met again with Netstream on July 19, 2010, during which time Netstream would not enter into any contracts or agreements with Hotwire due to Hotwire's decision not to activate its network. *Id.* ¶ 100. In September 2010, Sizemore agreed to personally raise the additional monthly revenue sought by Hotwire. *Id.* ¶ 103. Between June and October 2010, Hotwire executives made plans for several trips to Atlanta to meet with Sizemore, all of which were cancelled. *Id.* ¶¶ 99, 105-06. By October 2010, Hotwire stopped communicating with Sizemore. *Id.* ¶ 107.

Three years later, in September 2013, Hotwire began activating its Atlanta network. *Id.* ¶ 114. This included using the 55 Marietta Street facility and taking various other steps that, according to Sizemore, came "right out of Sizemore's business plan." *Id.* ¶¶ 114, 116, 118.

4

Hotwire now operates in ten states, including Georgia. *Id.* ¶ 15. Sizemore alleges that the failure of Hotwire's roll-out in 2010 harmed his relationships within the telecom industry, and that the success of Hotwire's launch in 2013 tarnished his reputation. *Id.* ¶¶ 109, 111.

Sizemore filed suit against Hotwire on September 26, 2014. Hotwire moved to dismiss under Fed. R. Civ. P. 12(b)(6) on October 22, 2014, Sizemore responded on November 11, 2014, and Hotwire replied on November 18, 2014. Sizemore thereafter filed a first amended complaint on November 20, 2014. Hotwire again moved to dismiss on December 11, 2014, Sizemore filed a brief in opposition on January 9, 2015, and Hotwire replied on January 16, 2015.

## II.    STANDARD OF REVIEW

In evaluating a motion to dismiss under Rule 12(b)(6), courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks and citation omitted). The pleading standard of Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). The complaint must contain sufficient factual matter to be plausible on its face. *See id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"; a sheer possibility that a defendant acted unlawfully is not sufficient. *Id.* Therefore, to survive a motion to dismiss, plaintiffs must allege facts sufficient to have "nudged their claims across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570.

Counts I and II of the complaint, claiming fraud in the inducement and fraud and deceit, respectively, are additionally covered by the heightened pleading standards of Rule 9, which states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This particularity requirement is designed "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984). The Third Circuit has therefore interpreted Rule 9(b) to mean that a plaintiff bringing a fraud claim must generally "plead the who, what, when, where and how: the first paragraph of any newspaper story," *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009) (internal quotation marks omitted), or "otherwise inject precision or some measure of substantiation into a fraud allegation," *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007).

## III. DISCUSSION

Sizemore brings seven claims against Hotwire: fraud in the inducement (Count I), fraud and deceit (Count II), breach of contract (Count III), promissory estoppel (Count IV),[2] breach of implied contract (Count V), conversion (Count VI), and unjust enrichment (Count VII). Hotwire argues that Sizemore has failed to state a claim on any of these counts, and that Sizemore's fraud and conversion claims are further barred under Pennsylvania's "gist of the action" and economic loss doctrines. I will first evaluate each of plaintiff's claims, then address the two state doctrines.

---

[2] Count IV of the amended complaint is styled as a claim of "detrimental reliance," but in Pennsylvania, "[d]etrimental reliance is another name for promissory estoppel." *Travers v. Cameron Cnty. Sch. Dist.*, 544 A.2d 547, 550 (Pa. Commw. Ct. 1988). Adding to the confusion, a plaintiff must prove three elements to make out a claim of promissory estoppel, and "[t]he second [element] is often referred to as 'detrimental reliance.'" *Ndubizu v. Drexel Univ.*, 768 F. Supp. 2d 796, 801 (E.D. Pa. 2011). Moreover, plaintiffs themselves subsequently refer to Count IV as raising a claim of "promissory estoppel (detrimental reliance)." *See* Pls.' Br. Opp. at 13. For the sake of clarity, I will therefore view Count IV of the amended complaint as bringing a claim of promissory estoppel.

### A.   Fraud in the Inducement & Fraud and Deceit

In Pennsylvania, common law fraud claims require that plaintiffs prove:

(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

*Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994). This standard governs both claims of fraud and deceit (also known as "intentional misrepresentation" in Pennsylvania, *see id.*) and claims of fraud in the inducement. *See Eigen v. Textron Lycoming Reciprocating Engine Div.,* 874 A.2d 1179, 1185 (Pa. Super. Ct. 2005) (setting out the same elements for fraud in the inducement); *see also Nat'l Educ. Fin. Servs., Inc. v. U.S. Bank, Nat'l Ass'n,* No. CIV.A. 12-6651, 2013 WL 6228979, at *3 (E.D. Pa. Dec. 2, 2013) ("Fraud in the inducement, to the extent it is a separate cause of action from intentional misrepresentation, has a virtually identical standard.").

Here, plaintiff has adequately pleaded each of the elements for fraud. Sizemore alleges that Hotwire falsely represented to him that it "approved and accepted" his business plan and that it would pay him in the range of $120,000 per year for his efforts. Sizemore further alleges that this misrepresentation was intended to lead him into setting up contacts between Hotwire and various third parties in Atlanta, that he reasonably relied on this promise in making such connections and preliminary deals, and that he has suffered harm to his reputation and business relationships as a result of his reliance.

Moreover, plaintiff has satisfied Rule 9(b) with regard to the fraud counts by "plead[ing] . . . the date, time and place of the alleged fraud or otherwise inject[ing] precision" into the amended complaint. *Frederico*, 507 F.3d at 200. The pleadings specify who made the alleged misrepresentations (generally Johnson, Hotwire's president), when they were made (in May and

7

June 2010), and where they were made (by email or telephone between Sizemore in Georgia and

Hotwire in Pennsylvania), among other information. At bottom, these details are sufficient "to

place the defendant on notice of the precise misconduct with which [it is] charged." *Id.* (internal

quotation marks omitted). Sizemore has therefore plausibly stated claims for fraud in the

inducement and fraud and deceit in Counts I and II of the amended complaint, respectively.

### B.   Breach of Contract

"Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract

action must establish '(1) the existence of a contract, including its essential terms, (2) a breach of

a duty imposed by the contract[,] and (3) resultant damages.'" *Ware v. Rodale Press, Inc.*, 322

F.3d 218, 225 (3d Cir. 2003) (citing *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa.

Super. Ct. 1999)). Here, the existence of at least one contract between Sizemore and Hotwire is

undisputed: the NDA, as entered into by both parties on December 16, 2009. It provides in part:

1. The Parties intend to hold discussions concerning a potential business transaction (the "Purpose"). In connection with such discussions, it may be necessary for one Party to disclose to the other Party, certain information that the disclosing Party wishes to be held in confidence. This Agreement sets forth how such information is to be treated and may be used.

2. As used herein, "Confidential Information" of a Party means, any and all information disclosed orally, visually, or in tangible form by such Party ("Disclosing Party") to the other Party ("Receiving Party"), whether prior to or after the Effective Date hereof. . . .

3. Subject to Section 4, Receiving Party agrees that it will hold the Confidential Information received from Disclosing Party in confidence and not disclose it to any third party, except as approved in writing by Disclosing Party, or as permitted by this Agreement. Receiving Party will not use the Confidential Information of Disclosing Party except in connection with the Purpose. . . .

*See* NDA (Doc. No. 15-1) ¶¶ 1-3. Sizemore claims that the NDA "covered and protected [his]

business plan" and that Hotwire breached this duty "due to the irreverent theft under the NDA of

[his] business plan." FAC ¶¶ 152, 155. Sizemore further alleges that he suffered various harms

8

as a result of this breach, including "lost revenue streams, lost earnings and profits, lost contracts and accruals; lost goodwill and other tangible and intangible values and benefits including lost/foreclosed business and market opportunities (actual and forecasted)." *Id.* ¶ 155. Under the terms of the contract between Sizemore and Hotwire, in other words, Hotwire agreed not to use "Confidential Information" from Sizemore except in connection with their potential business dealings. According to the pleadings, however, Hotwire used Sizemore's confidential information (i.e., his business plan) for its own purposes years after its relationship with Sizemore had ended, and Sizemore suffered damages as a result.

Hotwire's response is unpersuasive. It argues that Sizemore's business plan "contains no confidential information of any sort, but rather is a generic high-level marketing piece." Mot. Dismiss 9. Hotwire further asserts that Sizemore has not "alleged that Hotwire disclosed any of DVComm's confidential information" and has "fail[ed] to identify any specific confidential information in the plan." *Id.* at 10. First, under the NDA, if Hotwire wishes to be relieved of its obligations with respect to the business plan, it bears the burden of showing that information received from Sizemore was not confidential—not the other way around. *See* NDA ¶ 4. Second, such a dispute over whether information contained within the business plan was truly confidential must await future stages of litigation; for the purposes of this motion, I assume the truth of Sizemore's allegation that the business plan was confidential. Third, Sizemore could prove breach of the NDA even if Hotwire did not "disclose" anything: under Paragraph 3, cited above, mere misuse of confidential information can result in breach. In sum, Sizemore has made out a plausible claim for breach of contract in Count III of the amended complaint.

### C.     Promissory Estoppel

Pennsylvania courts require a plaintiff to prove three elements to make out a claim of promissory estoppel:

> 1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise.

*Crouse v. Cyclops Indus.*, 745 A.2d 606, 610 (Pa. 2000); *see also Edwards v. Wyatt*, 335 F.3d 261, 277 (3d Cir. 2003).  Here, Sizemore alleges that "[t]he NDA was the means by which Hotwire induced" him to act, that he took action in reasonable reliance on the NDA, and that injustice can only be avoided by compensating him for the damages he suffered.  FAC ¶¶ 160-64.  For the purposes of this motion, I assume these allegations are true.  However, the NDA is a contract, and the Third Circuit has made it clear that promissory estoppel applies only to enforce a promise not supported by consideration—that is, where no binding contract has been formed. *See Carlson v. Arnot-Ogden Mem'l Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990) ("In light of our finding that the parties formed an enforceable contract, relief under a promissory estoppel claim is unwarranted.").  In other words, promissory estoppel does not apply when parties have entered into an enforceable agreement.  Sizemore's promissory estoppel claim against Hotwire thus fails as a matter of law, as the promise at issue is the NDA contract between Hotwire and Sizemore.  I will therefore grant the motion to dismiss with respect to Count IV of the amended complaint.

### D.     Breach of Implied Contract

In Pennsylvania, "[a]n implied contract is one where the parties assent to formation of a contract, but instead of being expressed in words, the intention to incur an obligation is inferred from the conduct of the parties in light of the surrounding circumstances, including the course of dealing." *Crawford's Auto Ctr., Inc. v. Com., Pennsylvania State Police*, 655 A.2d 1064, 1066

10

(Pa. Commw. Ct. 1995) (citing *Cameron v. Eynon*, 3 A.2d 423 (Pa. 1939)).  Because the

existence of the contract is drawn by inference, "[o]ffer and acceptance need not be identifiable

and the moment of formation need not be pinpointed." *Ingrassia Const. Co. v. Walsh*, 486 A.2d

478, 483 (Pa. Super. Ct. 1984).  As above, a plaintiff claiming breach of implied contract also

"must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a

duty imposed by the contract[,] and (3) resultant damages.'" *Ware*, 322 F.3d at 225 (quoting

*CoreStates Bank*, 723 A.2d at 1058).

   Here, Sizemore claims that an implied contract arose out of his business plan for Hotwire.

*See* FAC ¶ 167.  The court need not accept as true any legal conclusions stated in a complaint,

*see Iqbal*, 556 U.S. at 678, and the Pennsylvania Supreme Court has long held that whether an

implied contract exists is a question of law.  *Reitmyer v. Coxe Bros. & Co.*, 107 A. 739, 741 (Pa.

1919); *accord DiBattista v. McKeesport Area Sch. Dist.*, No. 1627 C.D. 2012, 2013 WL

4477377, at *4 (Pa. Commw. Ct. Aug. 20, 2013), *petition for allowance of appeal denied*, 87

A.3d 321 (Pa. 2014).  Instead, as defendants correctly note, "a complaint alleging the existence

of an implied contract must . . . actually allege a fact pattern which might show that there was a

meeting of the minds and that there were mutual undertakings." *Hirsch v. Schiff Benefits Grp.*,

LLC, No. CIV.A. 10-2574, 2011 WL 1166127, at *3 (E.D. Pa. Mar. 28, 2011) (citing *In re Penn.*

*Cent. Transp. Co.*, 831 F.2d 1221, 1228 (3d Cir. 1987)).  Accordingly, defendants argue that the

business plan did not establish mutual undertakings because it "is an advertisement, a piece of

puffery" that "does not set forth any duties or obligations whatsoever." Mot. Dismiss 13.

Hotwire further argues that the business plan is too preliminary a document to create any such

mutual obligations, because the plan itself refers to the need to "set[] attainable goals" that "will

be defined and measurable and agreed upon by all parties." *Id.* Ex. B at 4.

If the existence of an implied contract here turned solely on the text of the business plan, defendants could very well prevail on these arguments. However, Sizemore pleaded that he sent a revised business plan to Hotwire on May 5, 2010, and that Hotwire "accepted and approved" the plan—presumably, the revised version—that same day. *Id.* ¶¶ 65, 71. It is unclear which version of the business plan Hotwire attached to its motion, but the document is dated April 22, 2010, and Sizemore alleged that he sent the original version of the business plan to Hotwire "prior to the scheduled April 23, 2010 meeting in Philadelphia." *Id.* ¶ 48. Moreover, even if the document attached to Hotwire's motion is in fact the revised business plan, Sizemore has also alleged that he met with Hotwire executives at least once, on April 23, 2010, to discuss his proposal in person. *Id.* ¶ 61. Whatever representations were made at that meeting, if any, are not yet part of the factual record. The text of the business plan as attached to Hotwire's motion alone, therefore, is not dispositive of Sizemore's breach of implied contract claim.

On the contrary, Sizemore has pleaded sufficient facts to make out a plausible claim for breach of implied contract. The essential terms of the deal were that Sizemore would carry out the steps outlined in his business plan (in whatever version was accepted on May 5, 2010), in exchange for which Hotwire would pay him in the range of $120,000 per year. Sizemore has further alleged that he performed under the implied contract, *id.* ¶ 169, that Hotwire breached, *id.* ¶ 168, and that he suffered damages as a result, *id.* ¶ 170. Hotwire finally argues that Sizemore's goals under the plan were too "undefined" to give rise to a contract, and it is true that "[w]hether the terms [of a contract] are sufficiently definite is a question of law." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 585 (3d Cir. 2009). However, Sizemore's duties may have been clarified during his in-person meeting with Hotwire, and Hotwire's central obligation toward Sizemore was expressed orally. *See* FAC ¶ 96 ("Johnson verbally agreed to pay [Sizemore] in

12

the range of $120,000 per year as minimum base compensation."). In Pennsylvania, "[i]t is well settled that in the case of a disputed oral contract, what was said and done by the parties as well as what was intended by what was said and done by them are questions of fact for the jury." *Solomon v. Luria*, 246 A.2d 435 (Pa. Super. Ct. 1968). Indeed, the inquiry into "the understanding of the parties as expressed by [the terms of the contract]" is for the jury. *McCormack v. Jermyn*, 40 A.2d 477, 479 (Pa. 1945). It would thus be premature to dismiss Sizemore's breach of implied contract claim at this stage based on the purported vagueness of the (at least) partly oral agreement between Sizemore and Hotwire.

### E.   Conversion

Under Pennsylvania law, conversion is the "deprivation of another's right of property, or use or possession of a chattel, or other interference therewith, without the owner's consent and without legal justification." *Universal Premium Acceptance Corp. v. York Bank & Trust Co.*, 69 F.3d 695, 704 (3d Cir. 1995) (quoting *Cenna v. United States*, 402 F.2d 168, 170 (3d Cir. 1968)). As the Pennsylvania Supreme Court has explained, conversion can take place in several ways, including by "[s]eriously damaging or misusing the chattel in defiance of the owner's rights." *Norriton E. Realty Corp. v. Cent.-Penn Nat. Bank*, 254 A.2d 637, 638 (Pa. 1969). "When such an act occurs, the plaintiff may bring suit if he or she had either actual or constructive possession, or an immediate right to possession of the chattel at the time of the conversion." *Eisenhauer v. Clock Towers Assocs.*, 582 A.2d 33, 36 (Pa. Super. Ct. 1990).

Hotwire argues that Sizemore "fail[s] to plead any facts demonstrating that [he] enjoyed some right of property, let alone one that Hotwire interfered with." Mot. Dismiss 14. Sizemore has alleged, however, that Hotwire willfully misused his business plan—that is, his property—by following its guidance when Hotwire entered the Atlanta market in 2013. FAC ¶¶ 173-75.

Furthermore, the NDA, which Hotwire attached to its motion, specifies that the agreement did not "grant[] any property rights" in the business plan to Hotwire.  *See* NDA ¶ 8.  Consequently, Sizemore has made out a plausible claim of conversion in Count VI of the amended complaint.

F.      **Unjust Enrichment**

Unjust enrichment requires a showing of: (1) "benefits conferred on defendant by plaintiff," (2) "appreciation of such benefits by defendant," and (3) "acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value."  *Filippi v. City of Erie*, 968 A.2d 239, 242 (Pa. Commw. Ct. 2009) (internal quotation marks omitted).  In its motion to dismiss, Hotwire focuses on the first element, arguing that Sizemore "failed to identify any benefit . . . conferred on Hotwire," adding, "One is left only to guess as to the benefit conferred on Hotwire:  An introduction to a contact in Georgia?  Some shared ideas about the telecom industry in Atlanta?"  Mot. Dismiss 15.  Hotwire has guessed correctly.  Sizemore alleges that he personally introduced Hotwire's director of facilities, Grandizio, to at least five different contacts in the Atlanta telecom industry, and that these meetings resulted in initial partnership agreements between Hotwire and several businesses.  *See* FAC ¶¶ 73-85.  Sizemore further alleges that, as Hotwire's agent and on its behalf, he negotiated a nondisclosure agreement between Hotwire and Netstream.  *Id.* ¶ 86.  Likewise, Sizemore provided Hotwire with an initial business plan, a revised business plan, and in-person consultation.  *Id.* ¶¶ 48, 61-62, 65.  Hotwire may shrug off Sizemore as offering only "shared ideas," but he has alleged—and I must assume to be true at this stage—that his plan contained "unique" elements that were "essential to Hotwire's success in the Georgia market." *Id.* ¶ 53.  Moreover, Sizemore alleges that Hotwire accepted these benefits by building on the contacts he arranged and by "using [his] business plan" to enter the Atlanta market in 2013.  *Id.*

14

¶¶ 114-21.  Finally, Sizemore asserts that it would be inequitable for Hotwire to retain these benefits without paying him some value.  *Id.* ¶ 178.  Sizemore has therefore made out a plausible claim of unjust enrichment against Hotwire.

### G.   "Gist of the Action" Doctrine

In addition to arguing that Sizemore has failed to make out any claim for which relief can be granted, Hotwire asserts that Sizemore's tort claims (i.e., fraud and conversion) should be dismissed under the "gist of the action" doctrine.  In Pennsylvania, the gist of the action doctrine is "employed to ensure that a party does not bring a tort claim for what is, in actuality, a claim for a breach of contract."  *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 60 (Pa. 2014).  "[T]he mere existence of a contract between two parties does not, *ipso facto*, classify a claim by a contracting party for injury or loss suffered as the result of actions of the other party in performing the contract as one for breach of contract."  *Id.* at 69.  Rather, under the gist of the action doctrine, "a purported tort claim [is] properly dismissed by a trial court [when] the true gist or gravamen of the claim [is] for breach of a contract which existed between the parties."  *Id.* at 68.

For several reasons, I will not dismiss Sizemore's fraud claims under the gist of the action doctrine.  First, while the fraud claims clearly overlap with the breach of implied contract claim, it remains to be seen whether that contract will be found to exist and, if so, what it entails.  Thus, it would be premature to dismiss the fraud claims for being too enmeshed with a contract that may yet be found never to have been formed.  *See Premier Payments Online, Inc. v. Payment Sys. Worldwide*, 848 F. Supp. 2d 513, 529 (E.D. Pa. 2012) ("When the validity and if valid, the effect, of a contract is uncertain, courts have found application of the gist of the action doctrine on a motion to dismiss to be inappropriate."); *My Space Preschool & Nursery, Inc. v. Capitol Indem. Corp.*, No. CIV.A. 14-2826, 2015 WL 1185959, at *8 (E.D. Pa. Mar. 13, 2015)

15

("Courts are reluctant to dismiss tort claims at the early stages of proceedings under the gist of the action doctrine."). Second, the gist of the action doctrine is generally less applicable to fraud in the inducement claims, "because [those] claims are much more likely to present cases in which a social policy against the fraud, external to the contractual obligations of the parties, exists." *The Knit With v. Knitting Fever, Inc.*, No. CIV.A.NO.08-4221, 2009 WL 3427054, at *9 (E.D. Pa. Oct. 20, 2009) (quoting *Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.*, 256 F. Supp. 2d 329, 341 (E.D. Pa. 2003)); *see also id.* at *7 ("[C]ourts in this district have shown some reluctance to dismiss claims for fraud in the inducement . . . early in the litigation.").

Likewise, I will decline to dismiss Sizemore's conversion claim on the basis of the gist of the action doctrine. The question is a closer one, because the conversion claim (arising from alleged misuse of the business plan) overlaps with Sizemore's breach of contract claim, and there the existence of a contract—the NDA—is not in dispute. However, "[w]hen a plaintiff has a property interest in the thing that is the subject of a conversion claim, the gist of the action doctrine does not bar recovery under a conversion theory even though the property may also be the subject of a contract." *Orthovita, Inc. v. Erbe*, No. CIV.A.07–2395, 2008 WL 423446, at *6 (E.D. Pa. Feb. 14, 2008) (citing *Berger Montague v. Scott & Scott*, 153 F. Supp. 2d 750, 753-54 (E.D. Pa. 2001)). Here, Sizemore has a property interest in the business plan, and thus the gist of the action doctrine should not require dismissal of the conversion claim merely because the plan is also covered by the NDA between Sizemore and Hotwire.

### H.   Economic Loss Doctrine

Similar to the gist of the action doctrine, the economic loss doctrine assists in maintaining the distinction between tort and contract actions. *See Air Prods.*, 256 F. Supp. 2d at 335 (citing *New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp.*, 564 A.2d 919, 925 (Pa. Super.

16

Ct. 1989)).[3]  Under the economic loss doctrine, plaintiffs cannot recover "in tort economic losses to which their entitlement flows only from a contract." *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 671 (3d Cir. 2002) (quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995)).  More specifically, "a plaintiff should be limited to a contract claim 'when loss of the benefit of a bargain is the plaintiff's sole loss.'" *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 104 (3d Cir. 2001) (quoting *Duquesne Light*, 66 F.3d at 618).

Here, Sizemore does plead that he lost the benefit of the bargain with Hotwire—but he also asserts that he suffered "strained and soured relationships with virtually every one of his relevant contacts and leads in the Georgia-wide telecommunications industry" and a "reputation [that] was tarnished and marred by the stigma of Hotwire's conduct and deceit towards him." FAC ¶¶ 109, 111.  These damages allegedly resulted from Hotwire's fraud and conversion, and since they go beyond loss of the mere benefit of the bargain between Sizemore and Hotwire, I will not dismiss Sizemore's tort claims under the economic loss doctrine, either.

## IV.   CONCLUSION

Sizemore has made out plausible claims against Hotwire for fraud in the inducement (Count I), fraud and deceit (Count II), breach of contract (Count III), breach of implied contract (Count V), conversion (Count VI), and unjust enrichment (Count VII).  I will therefore allow those claims to proceed.  However, Sizemore's promissory estoppel claim (Count IV) fails as a matter of law, so I will grant Hotwire's motion to dismiss with respect to that claim alone.

An appropriate order follows.

---

[3] "Although the Supreme Court of Pennsylvania has not ruled on the viability of the economic loss doctrine, an *en banc* panel of the Pennsylvania Superior Court adopted the doctrine . . . [i]n *REM Coal Co. v. Clark Equipment Co.*, 563 A.2d 128, 134 (1989)." *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 671 (3d Cir. 2002).  Moreover, Sizemore challenges only the application of the economic loss doctrine to this case, not its availability as a defense in general.

17